is 19-1477 Wellesley Corporation v. Zoom T-Vac. Good morning, your honors. My name is Daniel McCarthy. I'm the attorney for the plaintiff's appellate in this matter. On page 28 of the blue brief, I'm sorry, on page 28 of the blue brief, you say that, quote, Zoom's current website, ellipsis, causes instant confusion because any consumer would be led to believe that stuff is associated with Zoom. What proof is there in the record that a, quote, a consumer would be led to believe this? Your Honor, I believe I cited in my reply brief the case of, or actually, I think I cited in both my briefs, the case of U.S. Structures Inc. versus J.P. Structures Inc. And I'm relying on the record evidence of the Zoom T-V products website, which was submitted as attachment to the complaint filed in this matter, as well as the by stuffed products screenshots. You never raised the Zoom website as a breach in your opposition to the motion for summary judgment. It was attached as. It wasn't a document that was attached, but you never argued that the breach consisted of maintaining the Zoom website. I believe that it was also mentioned in the Camerano deposition transcript. No, I'm talking about your summary judgment opposition. If you thought the breach was maintaining the Zoom website, you needed to say that to the district court. I have read your opposition. It does not mention the Zoom website. The brief itself. Yes, Your Honor, you're correct. OK, so let's focus on the other website to buy stuff dot com. Correct. So what's the breach here? The we have from Zoom an email to the website operator telling him to take it down even before the settlement agreement. What is it that they did that was a breach? What they did was they continued to have the website operational that had the what do you mean images? It was operated by a third party, right? I believe Idea Village was operating a website in which under the settlement agreement, paragraph three that Zoom TV products assumed responsibility for. So the website was not operated by a third party, but by Idea Village. Yeah, I believe Idea Village took responsibility, was responsible for maintaining that website and Zoom TV products under paragraph three of the settlement agreement was responsible for anything, omissions and actions of Idea Village. So what about this email that told him to take down the website? That wasn't to Idea Village. It was to a third party. What is that? What do we get out of that? I'm not sure how to answer that question. I apologize. The record evidence that was submitted to the district court and candidly, Your Honor, I was not the attorney below. Okay. But the record evidence which were attached to the briefs were these screenshots where there was no, no. Let me rephrase that. The record evidence was the Buy Stuff screenshot website that both Zoom and Idea Village admitted never said that it wasn't their websites. Okay. So what happened here? You reach a settlement agreement. Presumably everyone is satisfied. Correct. And then a few months later, it was taken down. Okay. So for a few months after the settlement agreement, let's assume for the sake of argument that the Buy Stuff website still had the matters on it. And they took it down. What is the complaint? You didn't seek any damages for anything you suffered, any harm you might have suffered. You didn't allege any harm during that several month period before they took it down, right? We could not prove actual damages. Correct. Okay. So you didn't allege any damages, right? You didn't allege any harm? In the prayer for relief, there was a request for contractual damages of attorney fees, which I argued in my brief, which is a form of compensatory damages under Michigan law because it was provided for in the contract. Number two, my client bargained for it. You can't say I was damaged because I started a meritless lawsuit and incurred attorney's fees in connection with that. The question is whether there was any lawsuit in the first place. And what I think we're trying to understand is what happened here. I mean, you're not contending they sold any of the product, right, after the settlement agreement. We did not prove that they sold any product after the settlement agreement. Correct. So what's the damage? The damage is that paragraph six of the settlement agreement that my client bargained for was immediately ceasing upon signing that July 22, 2016 settlement agreement, ceasing website activities. That's immediate. And the court is bound to uphold the language of the settlement contract. So even though they didn't sell any product, your theory is they should have taken the website down earlier? They should have removed my client's images and the stuff's marks and trademarks from its website upon signing that settlement agreement. The Buy Stuff's website. Correct. And what harm did that cause except for, let's leave aside the fact that you filed suit so there were attorney's fees incurred with the filing of the current complaint. Correct. But beyond that? To answer the court's question, what gave rise to this lawsuit was that the market was hit with a number of counterfeit products that my client believed emanated from the defendants. That was the gist of this lawsuit. And when he's going on their websites and he's seeing that they're still listing his... So did you allege that there was harm in the complaint? Did you allege that as a result of their maintaining the website in contravention of the contract, the agreement we had, it's resulted in this loss because of the counterfeit? They didn't, no, they did not allege that. What they alleged in the complaint... You mean they, you mean you, your client. That's correct. I apologize. Okay. What they alleged in the complaint was we bargained for them not to have our products likeness on their webpages anymore. What I understood was that part of what you were complaining about was information that was still up on the web, which was exemplary. That is, this is the kind of page we have, and it happened to have your client's information on it. Is that not correct? Yes, it had my client's products. That's only true of the Zoom website, which you didn't even mention in your opposition. That's what the Zoom website is about. It's exemplary. You mean that it was promoting, both websites were exemplary in that regard, Bystuffs as well. I mean it was advertising this... But I think what Judge Wallach is referring to is their theory is we provide services to people, advertising services. The Zoom website had this reference to your product on it as an example of the kinds of services that we provide to people. Correct. Right. And I'm suggesting to you that we need not concern ourselves with the Zoom website because you didn't even mention it in your opposition to summary judgment as being a fact issue. We have to focus on the Bystuffs website. Have you abandoned the Zoom website? Have I? Yes, as your client. I don't understand the question. I'm sorry. Have you abandoned any claim as to the Zoom website? No, my client wants to pursue enforcement of the settlement agreement because Zoom's rep... You can't bring it up if you don't mention it in the summary judgment opposition. It was attached as the exhibits to the briefing, which had the page plus the record deposition transcript, which mentioned the Zoom website. And under the court's de novo review, the court has to accept all of that evidence. And I agree that website was not mentioned in the briefing, but it was part of the record exhibits to that briefing. And the court didn't have all argument below either. And so my point was is that I believe it was attached, the complaint was attached, the screenshots were attached. One of the screenshots was from the Zoom products TV website. The Camerino deposition transcript, which is the corporate rep of Zoom, admitted that it's his website. He continues to use it and further admit it on the record in its deposition, which was given to the district court. I'm using Wesley's product to continue to advertise the services... You can't raise issues by throwing documents at the district court. You've got to argue something in your opposition to the summary judgment motion, and you didn't. So why don't you accept that? So what is left if that is our conclusion? Under the paragraph six, the court has to give effect to all words in the contract. Immediately cease means just that, immediately. Not tomorrow, not six months after the fact. They agreed to immediately cease website activities. And at the very least, the buy stuffs... So if you didn't allege any harm, I mean, so they took it down, we agree, they took it down several months later. So the best you have is the complaint that they were supposed to take it down immediately. And they waited three months. And what? And therefore you were entitled to attorney's fees for having brought the case? Yes, you are. Because that's what they bargained to do under the settlement agreement. Correct. But why wouldn't you interpret the settlement agreement as saying we're going to stop advertising this stuff for sale? And they were no longer advertising it for sale because they weren't trying to sell it. But intent in their actions is irrelevant to a breach of contract action. It depends on what the contract means. If the purpose of the contract is to stop them from selling the product, it accomplished that purpose, you agree with that. And if you read the term advertising in the contract referring to advertising for purposes of selling the product, they weren't doing that. But they were because those screenshots continued to exist after that. Supposing they had taken the website down the next day, would that have complied with the agreement? As a practical matter, I'm sure the lawsuit wouldn't have been brought if the website or the product was removed. Would it have complied? Probably so. I would say that's within the realm of immediately upon the norms of signing a settlement agreement and taking action. Two days? I'm sorry? Two days? I think if we got into issues of splitting hairs of days or hours following the settlement agreement, we would get into the customs. But I would imagine one or two days after would have been under the guise of immediately cease. But months after, that's well beyond immediately ceasing. Otherwise, the court is not giving effect to immediately ceasing all website activities. Zoom agreed to immediately cease website activities. What activities were happening? The website itself continued to exist, and my client also had – there was an interactive buy function. And your client bought stuff off of the website? I believe he was, yes. One of the screenshots that we attached to the brief was the operation of submitting an order for that product. But you never caught the product because they weren't selling the product. I understand that, Your Honor, but that's not the point of paragraph six of the settlement agreement. That's the question. Okay. Why don't we hear from the other side? I reserve the remainder of my brief. Thank you, Your Honor. Good morning, Your Honors. May it please the court. Josh Lassman on behalf of the appellees. As Your Honors have noted, what we're dealing with here is we have a situation where – What's the significance of this email that you're relying on? The significance of the email, Your Honor? Where do we find it in the record? That's going to be at Appendix 101. This is the email that was sent by Idea Village. That was before this lawsuit was ever filed. It was actually before the first lawsuit was ever filed. It was indicating that that website was supposed to be taken down. I'm sorry. This is part of the declaration. It's not at 101. I'm sorry. It's part of the – that's correct, part of 103. So the fact is that there was a request that it was to be taken down. Idea Village had all expectation that it was going to be taken down. And what we have additionally here – Who's the recipient of this email? SVP Sales? Yes. What's that? What's their role? They're a third party that was running or in charge of shutting down that website. So we made that request to them and saying, please shut down this website. It's no longer operational.  I don't know the answer to that question, Your Honor. I know that that was who we requested have it taken down. And furthermore, as has been noted by the Court many times over during the quick colloquy with Plaintiff's Counsel, Appellant's Counsel, is that the purpose of the settlement agreement was to prevent Idea Village and Zoom from selling the product. And there was no question and has been never any question about the fact that Zoom and Idea Village haven't had any product since after the settlement agreement took place. Without any inventory to sell, they couldn't make any sales. And so without any sales, you can't have any damages. And the District Court seized on this plain and simple fact and stated, listen, even if you want to talk about the potential words in this agreement saying you're advertising and promoting these products, you still wouldn't be able to get through the final hurdle, which was you have to prove the causation of some kind of damages. The record at the District Court was totally bereft of any of that. The date of this email is August 27, 2015? That's correct. And when was the site actually taken down? The Buy Stuff website was taken down at some point in time in 20, I believe it was 2017. So up until this point- Who took it down? I believe it was whomever it was that was the administrator of that site. You mean SVP? That's correct. Were they the administrator? Pardon me? Was SVP the administrator? It sounds like they're a- or at least was in control of shutting down the website for Idea Village. So it took them two years to shut it down? Well, nobody had any expectation that it wasn't going to happen. And indeed, Your Honors, we didn't know that it wasn't going to happen. It was an oversight and certainly a mistake. But it doesn't mean in and of itself that that was a damage that caused any kind of damages to plaintiffs. I guess the question is whether the settlement agreement satisfied by you're making or Idea Village making this request to shut it down when the third party didn't apparently act on the request. Isn't that the issue? It certainly may be, but that's not the issue that's before the court. Well, I think it is one of the issues that's before us, whether there was a breach of the agreement at all. Sure. And the agreement itself is related to the sales of that product. That was the intent of the parties when they negotiated that agreement, which was to say, listen, we're giving you all of your product back. You no longer want to do business with us. You no longer want to sell off our websites. And we're happy to provide you with all of that. We're going to pay you for the product that's already existing in the marketplace so that there's a clean severance of this agreement that we had. Were some sort of molds or something as well involved, were there not? Yes, there were, Your Honor. And that issue was soundly defeated. The district court recognized that that was not part of the settlement agreement requirement, that the appellees were only required to put Mr. Hansen in contact with the manufacturer of those molds. Again, no evidence that that was not done or that we breached the settlement agreement in that fashion there as well. So that issue isn't on appeal. It's not been argued by appellant on appeal. And that is precisely one of the reasons, as you've been mentioning, Your Honor, that we have a very difficult time with this, is because the record as it stands at the district court was very clear that there were no evidence of sales, no evidence of inventory, no evidence of damages as to either the breach of contract and or the trademark infringement action. And now what we have on appeal is appellant's attempt to upset the roles of the courts in trying to give appellants a second shot at what should have been his opportunity at the summary judgment stage at the district court. What do you mean second shot? Is that to include Zoom? I mean, what do you mean? Not necessarily, Your Honor. It's just the arguments that are being made here on appeal by appellant. None of them were raised at the district court level. We're addressing arguments now for the very first time regarding nominal damages and contract. I don't understand that. They certainly raised with the Buy Stuff's website. They said you didn't take it down as promptly as you were required to by the agreement. One of the questions is whether the request to a third party to take it down was sufficient to satisfy the settlement agreement. I think that it is, Your Honor. Nobody had any expectation that it was there. Even if it's a breach, even if we want to say that the existence of the Buy Stuff's website beyond the date of the settlement agreement, regardless of whether or not there were any activities going on, there was no question that we couldn't buy anything. You couldn't buy a product of appellant's from the site, even if it was there to be seen. That the mere sight of that website being alive was in some way causing damages to the plaintiff, which is an essential element of the breach of contract action that he brought against our clients. Did the appellant argue in its complaint in any fashion that there was confusion caused? That is, that somebody looking for this product might go to your website and try to buy it and be unable to and then decide not to buy it because of that? Well, it was generally alleged, Your Honor. And that's obviously, and I think even the complaint states that they expected through discovery to be able to go out and to identify other people in the public that were trying to purchase Mr. Hansen's product and were unable to. First, a couple of things on that point. One, these parties are not in competition with one another. Idea Village and Zoom are not selling a competing product, right? The product is Mr. Hansen's and all Zoom and Idea Village were doing was providing him with a platform to sell his product. The second point of that is that they had over a year of discovery to obtain that opportunity to identify some other consumer other than Mr.  And that somebody who had visited these websites had then actually, in fact, purchased the product from us and received a product that was then either legitimate or counterfeit. Well, supposing it was somebody who tried and didn't purchase? And that may very well be, Your Honor. However, that's not proof of damages. I mean, it's this ephemeral doubt that plaintiff is trying to say is, oh, somebody could have done this. Get an opportunity for over a year to go out and to talk to other people who potentially may have gone to the site, who may have tried to purchase this product, thought they were purchasing product A, and then purchased product B. That in and of itself is not sufficient. What Judge Wallach is saying to you is they went to the website and tried to purchase the product and couldn't, so that's meant to them that it was no longer available, and so they didn't try to purchase it from an alternative source. That's the theory. Here's the interesting thing about that point, Your Honor, and I see your point. The point is that without going specifically to, if you're a consumer, the way that you're going to find this product is not by going directly to the Zoom product website, as they mentioned. That URL is buried in SEO. You're not even going to find it in the first 10 pages of Google. If you're interested in purchasing this product, you can type it into your Google search bar or go directly to Amazon, and the products will be available for sale in those first five or six links. There's not been any testimony by anybody other than Mr. Hansen himself saying that I went to these websites and they're leading to a dead link and it's going to frustrate the consumer. The likelihood of confusion element that they're required to prove in order to sustain their burden for summary judgment indicates that they've got to say that the public believes that there's some other person out there that believes that the product is being offered for sale by us and it's actually theirs. It's not really even a true trademark claim in the sense because we're not competing against the product. We're not offering our own products for sale. We had no product of Mr. Hansen's to sell any longer. And so with that, the district court was correct in recognizing you can't have a breach of the contract if you didn't have products to sell, if that was the purpose of the agreement. And it seems to me that your claim was that when Mr. Hansen got into the webpage, he did it through some sort of sleight of hand. He may have had the specific URL there available. He was aware that those sites were operating. It's his product after all. But a general consumer is not going to just land, is not going to be looking for a Stuffs burger slider or a Stuffs product and accidentally search through Google and find this. There's literally dozens of other links that are going to lead to sites that are going to provide them with the product that they're seeking. So I'm not sure where we're going with this because the settlement agreement requires you take down the website. That's correct. So is your argument that even if you never complied, if you completely refused to comply with that aspect of the settlement agreement, it would have been okay because nobody would have ever used it and there was no harm? Well, the settlement agreement says that we can't sell this product any longer. There's no website activities is what I think is going to be. Is that settlement agreement? Are we talking about Appendix 36? Yes, I believe that's correct, Your Honor. So it says paragraph six. Is that the one, the operative one? Yes, that's correct. Okay. So it says it will immediately cease all sales, advertising and promotion of Stuff and Stuff slider products. This includes any website activities and or advertisements. And at this point... So your view is website activities and or advertisement only meal mean doesn't have an independent meaning, it just is tied to the sales? That's the plain and ordinary meaning of those words is when you're saying advertisement or activities, that it's advertisement or activities for the purposes of making a sale. That's why it's underneath the agreement, the heading sales and inventory. Because the real crux of the agreement was Zoom and Idea Village were going to get paid a portion of whatever it is that they sold from their websites. That's how these licensing agreements work. Mr. Hanson no longer wanted to be part of that. There was a previous agreement that we had already settled. We paid him for the product that was in the marketplace. And that's this settlement agreement here. He wanted us to stop selling his products. Now what he's trying to do is he's trying to do, through summary judgment and now on appeal, is try to inject new alternative meanings when none of that argument was ever made at any point in time during the district court. And even if it was, the plain and ordinary meaning of those words would all be connected with the qualifier that they're for sales. There's never been any dispute that appellees couldn't have sold anything because they didn't have anything to sell. Wait. If you look at, just look at that sentence. It says cease all sales, advertising, and promotion of stuff. So you're saying advertising and promotion of the products, including any website activities and or advertisement, only exists if they're also for sale? That's the purpose. The plain meaning of those words is you're advertising something for sale, promoting something for sale. Where is that plain meaning? Show me in the, it says and. Sales, advertising, and promotion. You're going to immediately cease all three of those. So they're separate and distinct, right? Well, they're advertising for sale of his products. Advertising and promotion of his products. So it's where we are no longer going to put his products on the market for sale, either through advertising or through promotion. And once again, your honor, this is all brand new and novel arguments to appellees at a stage where it should have been made. After having the website up, apparently, after the period of time settlement agreement, the screenshots beginning in September, you're waiting nearly five months before you file a lawsuit. Not an email, not a text message, not a phone call, not a demand letter to appellees saying, hey, by the way, your website is still live. And so what would have happened if they had made that? They would have shut it down immediately, your honor. And this entire litigation probably would have been resolved at that point. So when did you actually shut it down, the date the lawsuit was filed? I believe it was shut down at some point in time subsequent to that. What's that mean? At some point in time after the lawsuit. Like a day or six months? Two days. I don't know exactly the number of days. Well, if you're suggesting a phone call would have done it, precluded the lawsuit, then you ought to be representing to us that you would have done it immediately. Oh, sir. I mean, if Idea Village had known that it was still up, they would have taken it down. They would have taken it down. And I think it took some time, sure, to get that request to go through. Well, the email that we were talking about earlier was two years before any of this happened. It was a year before the settlement agreement. That's correct. So notwithstanding that, even if it was up, and even if we were delayed in taking it down, it still doesn't indicate that there was any kind of breach of the agreement and or that it caused Mr. Hanson any kind of harm. And the district court was very clear on this, that that was totally unsubstantiated by the record. Thank you. Thank you. In our briefing, going to the infringement issue, the U.S. structures case continued trademark use by one whose trademark license has been canceled, satisfies the likelihood of confusion test, and constitutes trademark infringement. So? U.S. structures versus J.P. structures, 130. Yeah, but that involves continuing to sell the product using the trademark, right? The case talked about use of that mark. Yeah, but under the trademark law, use in commerce means you've got to attach it to a product. You've got to be trying to sell something. Well, it was attached to the product, meaning the Stuffs Burger product that was visible and advertised and promoted for sale, at least on the BuyStuffs screenshots, that, again, Zoom concedes it had a requirement to remove immediately upon signing of the settlement agreement. Whether a third-party website administrator delayed is irrelevant to the language of the settlement contract. That was Zoom's responsibility to do. It did not do it, and I understand. My client did not argue the concept of nominal damages to the district court, but it's our position on appeal that, as under the umbrella of compensatory damages, which my client did plead, the concept of nominal damages is a legal concept to recognize the sanctity of the breach. Did your client act immediately when he went online and found the Stuffs information? Yeah, I believe that the first screenshot was, like, in September of 2016, which is, like, a little over a month after. And what did he do immediately? The record shows that he took additional screenshots of subsequent months. That's acting immediately. Zoom and Idea Village had the obligation to act immediately, not my client. It was their—they were put on notice upon signing that settlement agreement. My client was not required. I guess what we're trying to—expressing some confusion about is, why is this lawsuit here? There's no—doesn't seem to be any damage, no sales of product. You've gone through the district court, come up here on appeal. Why? Your Honor, I'd like to address that. From my client's perspective, he wanted to sever all ties with Zoom and Idea Village. I don't want my product associated with these companies any longer. That was my intent. The fact that he was also trying to set up his own distribution line for his product and the fact that they continued to at least advertise or mention his product on their websites, which led to dead links, frustrated him and caused him—my product is being damaged because they are continuing at least through their websites of offering it or advertising it. You're in an intentional inflation of emotional distress. The settlement agreement says what it says, Your Honor, and my client, you know, a small-time inventor, invented this product. He got a legitimate patent on it, and it's his. They're out there still using it to this day. The Zoom TV product, and I understand, Judge Teig, that it could have been crystallized better at the lower court, but it does exist, and Mr. Camerano admitted it existed, and that is in the record. And I actually just checked last night. The website still exists. That's the frustrating aspect of this case. The settlement agreement was designed to put an end to it. Enough. Sever. Zero. And that's why I cited the mountain math decisions and the other decisions in my briefing when it comes to settlement agreements and website activities, which are construed broadly, not to be dissected narrowly. Thank you. We thank both sides in the case to submit it. That concludes our proceedings at this point. Thank you, Your Honor.